### Mrs. A. E. Hernischel v. Texas Drug Company.

Decided March 2, 1901.

**1.—Negligence—Fire Escape—Building Held Not a Factory.**

Within the meaning of a city ordinance requiring factories over two stories high to be provided with fire escapes, a building occupied by a wholesale drug company is not to be considered a factory because an inconsiderable per cent of the business conducted there was done in a laboratory room where a chemist and boy assistant were engaged in rebottling goods and compounding prescriptions in quantity for the retail trade.

**2.—Same—Discovered Peril—Fact Case.**

See evidence held not sufficient to charge the lessees of a building which caught on fire with such negligence as rendered them liable to one of their employes for injuries resulting from fire, nor sufficient to raise the issue of discovered peril.

Appeal from Dallas. Tried below before Hon. Richard Morgan.

*Crawford & Crawford,* for appellant.

*McCormick & Spence,* for appellee.

GILL, Associate Justice.—This action was brought by the appellant, Mrs. A. E. Hernischel, against the Texas Drug Company, the appellee, to recover damages for loss of the services of her minor son occasioned by personal injuries alleged to have been sustained by him as a result of the negligence of appellee. On the trial the court, after the evidence was adduced, instructed the jury to return a verdict in favor of the appellee, which was done, and judgment rendered accordingly. This is an appeal from that judgment.

Appellant's son was injured in the following manner. He was an employe on the third floor of the drug company's business house, and while so employed a fire broke out on one of the lower floors which prevented his escape by the elevator or stairways, and to escape death by fire he jumped from the third story window to the office roof, about fifteen feet below, whereby he was injured as alleged. Appellant seeks to fix lia-

bility upon the appellee: (1) Because it was alleged to be operating a factory in a building over two stories high, and had, in violation of one of the city ordinances of Dallas, Texas, failed to provide suitable fire escapes to the building so occupied. (2) The building, by reason of the character of stock carried and business done, was peculiarly liable to sudden and dangerous fires, and they failed to provide a safe place for said employe to work, and failed to provide rules and proper means for the extinguishment of fires. (3) The appellee, knowing of the presence of the appellant's son upon the third floor and of his danger after fire broke out, failed to notify him of his danger, but left him to ascertain it and escape as best he could.

Appellee answered by general denial, plea of contributory negligence, and specially denied that it was operating a factory within the purview of the city ordinances.

It was established without dispute that appellee, a corporation, was the lessee of a four-story brick building in the city of Dallas, Texas, in which it conducted its business and kept most of its stock of goods. It was a wholesale drug concern, engaged in buying in large quantities from the manufacturers, drugs, medicines, and druggists' sundries and such goods as are usually handled by the retail druggist, and selling at wholesale to the retail druggists throughout the State. It had on hand at the time of the fire a stock of goods of the value of $125,000. In the basement was kept the furnace for heating the building. In another part of the basement were kept cigars in boxes and alcohol, liquors, etc., in barrels and cases. The packing room in which goods were put up for shipment was also in the basement, and this contained hay, straw, etc., for use in packing. The greater part of its inflammable stuff, such as whiskies, paints, turpentines, oils, etc., was stored in another building.

On the first floor was the city department, the offices and a part of the stock consisting of bottled goods, pill boxes, and cases of drugs. In the remaining stories of the building were kept the stock of goods usually carried by the company. A part of the third floor was used by one Eberle, a stockholder in the company and the company's chemist, who was continually engaged in bottling goods bought in large quantities and placing them in convenient shape and quantity for the retail houses for which they were intended. He also compounded prescriptions and formulas in quantities and put them up in convenient form for the retail trade. In doing this he used the ingredients bought at wholesale and mixed them in their prescribed and proper proportions. His duties in these respects kept him and one boy (Ed. Hernischel) busy daily. Another boy was occasionally called in to assist, and a negro boy on the same floor assisted them occasionally in lifting heavy packages.

There was situated on this floor a stove for use in heating the various compounds together with utensils and vessels for the fluids, among which was a 50-gallon pot or boiler and several 50-pound lard cans. He had also a hand mill for grinding drugs, like the mill usually used in grocery stores for grinding coffee. They had no machinery in use in the dis-

charge of their duties. The entire product or output of Eberle and his assistants in this laboratory was less than 2 per cent of the business of the concern, and three-fourths of that output consisted not of compounded goods but of rebottled goods which had been bought in bulk in large quantities. No persons were stationed on that floor except Eberle and the three others above mentioned.

The fourth story was visited by the employes only as occasion required, no one being in constant charge of it. The building was 50 feet wide and 100 feet deep. The means of egress from the second and third stories was a stairway, five feet in width and conveniently located, and a large elevator operated by water power. They also had large windows and doors, and from the second story one could easily step from the window to the roof of the office, which was only about fourteen feet from the ground. There were no fire escapes on the outside of the building, and the only means of egree are stated above.

The city ordinances in question are as follows: "Article 487. That the owners or lessees of all hotels, theaters, boarding houses, tenement houses, and factories over two stories high in the city of Dallas, are hereby required to provide the same with good and suitable fire escapes, amply sufficient to furnish means of egree to all inmates in case of fire. Article 337, Code 1898. That the owners or lessees of all hotels, theaters, bording houses, tenement houses, and factories over two stories high in the city of Dallas, are hereby required to provide the same with good and suitable fire escapes, amply sufficient to furnish means of safe egress to all inmates in case of fire."

They had open barrels of water on each floor, with buckets attached, and had a water faucet on the third floor and one in the basement. On the third floor were also several ladders, some of which would have enabled a person to descend from the third story to the roof of the office without injury. On the day of the fire Eberle, the chemist, requested Ed. Hernischel to remain during the dinner hour from 12 to 1 and stir a mixture which he was preparing, and the latter was so engaged when the fire occurred. It was the custom of the employes, including Hernischel, to be out of the building and at their meals from 12 to 1 o'clock, as that hour had been given them for the purpose. The employes and officers in the city and office department on the lower floor remained on duty during that time. The fire occurred during the noon hour. No one except Eberle knew that Hernischel had remained on the third floor, and Eberle was at home when the fire occurred. There was a speaking tube from the office to the third floor, and Hernischel could have been notified in two or three minutes, had his presence there been known. The fire started on the first floor, and was so sudden and furious that the office employes had barely time to put a few books and papers in the safe and escape. When Hernischel heard the alarm he tried to make his way down the stairs, but was prevented by the smoke and flames. He then jumped from the third story window to the office roof and was severely injured.

We are of opinion that the proof is not sufficient to present the issue whether or not the company was operating a factory. If manufacturing was done in any proper sense, it amounted to only one-half per cent of the business of the concern and seems to have been a mere incident to its business.

The evident purpose of the ordinance was to provide additional means of egress from high buildings where the nature of the business required the employment or presence of many people. According to appellant's contention, a retail druggist conducting his prescription department on a third floor would come within the purview of the ordinance. A shoemaker with his bench, last, and awl would come within the definition.

In Black's Law Dictionary the word factory is thus defined: "In the English law the term includes all buildings or premises wherein, or within the close or curtilage of which, steam, water, or any machanical power is used to move or work any machinery employed in preparing, manufacturing, or finishing cotton, wool, hair, silk, hemp, or tow. Later this definition was extended to other manufacturing places." The American legal definition of the word is practically the same. We do not understand, however, that its meaning is confined to such enterprises as use machinery and mechanical power, especially in construing the ordinance in question. The rule should not extend beyond the reason for its application, but should extend at least that far. There are doubtless enterprises in this country using no machinery of any sort, and yet, in the strictest sense, coming within the proper definition of "factory." Such, for instance, are cigar factories, or factories where garments are made, and in each of which a large number of employes may be engaged in a single building or a small space.

The facts of this case bring it neither within the reason of the rule nor within the rule itself by any fair and reasonable construction. We are of opinion, therefore, that the court did not err in refusing to submit the issue. As bearing either directly or indirectly upon the question decided, see Hartraupt v. Wegmann, 121 U. S., 610; Roebling v. Wemple, 138 N. Y., 582; People v. Ice Co., 99 N. Y., 181; People v. Roberts, 50 N. E. Rep., 53; Cooperage Co. v. Parrish of Jefferson, 19 So. Rep., 476.

No issue of liability based on the theory of discovered peril is presented, for it is shown without contradiction that those who knew of the fire did not know of Hernischel's presence or danger, and Eberle, who had left him there, did not know of the fire until after his injury. Railway v. Breadow, 90 Texas, 27.

The appellant does no contend that the fire was caused by any negligence on the part of appellee or its employes. Neither its origin nor sudden fury is accounted for, nor is there any evidence that it could have been extinguished by any known means. The company had for some years been carrying on its business in the building in question in the usual way. It carried the character of stock usual with such concerns and handled it in the usual way. No employe was stationed in

the fourth story, only four in the third story, and these had as a means of egress an elevator and a stairway. The house was equipped with ample doors and windows, and had no unusual feature about it. We are of opinion that the facts present no issue of negligence on the part of the company, and that the court correctly instructed a verdict for defendant.

The judgment of the trial court is affirmed.

*Affirmed.*

Writ of error refused.